J. Albert BEL and Daisy B. Bel

v.

UNITED STATES of America (two cases).

Mrs. Ernest (Floy M.) BEL

v.

UNITED STATES of America (two cases).

David L. GARRISON and Marie G. Garrison

v.

UNITED STATES of America (two cases).

Rudolph E. KRAUSE and Della B. Krause

v.

UNITED STATES of America (two cases).

Civ. A. Nos. 6262–6269.

United States District Court
W. D. Louisiana,
Lake Charles Division.

March 14, 1958.

Norman F. Anderson, Lake Charles, La., for plaintiffs.

T. Fitzhugh Wilson, U. S. Atty., Shreveport, La., Charles K. Rice, Asst. Atty. Gen., James P. Garland and Anthony R. DeSanto, Dept. of Justice, Washington, D. C., for the United States.

HUNTER, District Judge.

These actions, involving common questions of law and fact, were consolidated for trial. Plaintiffs seek to recover income taxes allegedly erroneously and illegally assessed and collected as follows:

| | |
|---|---|
| J. Albert Bel and Daisy B. Bel | $3,161.82 for the taxable year 1952<br>1,680.92 for the taxable year 1953 |
| Mrs. Ernest (Floy M.) Bel | 144.30 for the taxable year 1952<br>95.49 for the taxable year 1953 |
| David L. Garrison and Marie G. Garrison | 2,361.36 for the taxable year 1952<br>1,988.38 for the taxable year 1953 |
| Rudolph E. Krause and Della B. Krause | 3,275.76 for the taxable year 1952<br>2,148.10 for the taxable year 1953 |

Question Presented

The sole and only issue in all of these cases is whether or not receipts from the extraction of sand and gravel from land belonging to the taxpayers constituted ordinary income,[1] or income subject to

---

1. Subject to an allowance for depletion under Section 23(m) of the Internal Revenue Code of 1939, 26 U.S.C.A. § 23(m).

the provisions of the capital gains sections of the Internal Revenue Code.

### Statement of Facts

The facts in this case are entirely stipulated. On January 1, 1952, J. Albert Bel, Mrs. Ernest (Floy M.) Bel, Marie G. Garrison, Della B. Krause, and others, entered into a contract with R. H. Witte. A copy of this contract is attached to the stipulation and is in evidence.

The payments due by R. H. Witte pursuant to the terms of this contract were made to J. Albert Bel, agent, who received such payments for himself and other parties to the contract. The plaintiffs herein who were parties to this contract received their share of the money in the following sums:

|  | Calendar Year 1952 | Calendar Year 1953 |
|---|---|---|
| J. Albert Bel | $8,793.86 | $6,421.90 |
| Mrs. Ernest (Floy M.) Bel | 764.68 | 558.44 |
| Marie G. Garrison | 6,117.47 | 4,467.41 |
| Della B. Krause | 8,793.86 | 6,421.90 |

In reporting the above sums in their individual income tax returns the plaintiffs classified these receipts as long-term capital gains; however, the report of examination made by an Internal Revenue Agent classified these amounts as ordinary income subject to an allowance for depletion. Upon this adjustment (and others not in controversy), the Commissioner of Internal Revenue assessed and collected additional taxes and interest thereon. The payments of income taxes originally assessed, the additional taxes and interest for the years here involved were as follows:

| Payors | Date of Payment | Calendar Year 1952 Tax | Calendar Year 1952 Int. from 3/15/53 | Calendar Year 1953 Tax | Calendar Year 1953 Int. from 3/15/54 |
|---|---|---|---|---|---|
| J. Albert Bel & Daisy B. Bel | 3/15/53 | $30,588.04 | | | |
|  | 12/16/55 | 3,863.44 | $586.50 | | |
| J. Albert Bel & Daisy B. Bel | 3/15/54 | | | $20,182.76 | |
|  | 12/16/55 | | | 2,127.56 | $195.32 |
| Mrs. Ernest (Floy M.) Bel | 3/15/53 | 3,547.97 | | | |
|  | 12/12/55 | 167.97 | 25.49 | | |
| Mrs. Ernest (Floy M.) Bel | 3/15/54 | | | 2,812.99 | |
|  | 12/12/55 | | | 122.82 | 11.27 |
| David L. Garrison & Marie G. Garrison | 3/15/53 | 36,123.70 | | | |
|  | 12/26/55 | 5,132.84 | 779.20 | | |
| David L. Garrison & Marie G. Garrison | 3/15/54 | | | 31,547.00 | |
|  | 12/26/55 | | | 1,831.12 | 168.11 |
| Rudolph E. Krause & Della B. Krause | 3/15/53 | 34,515.56 | | | |
|  | 12/13/55 | 1,889.48 | 286.83 | | |
| Rudolph E. Krause & Della B. Krause | 3/15/54 | | | 26,921.58 | |
|  | 12/13/55 | | | 2,693.96 | 247.32 |

On June 27, 1956, plaintiffs filed their respective claims with the District Director of Internal Revenue, District of New Orleans, Louisiana, seeking a refund of the income tax and interest thereon which was collected as a result of the adjustment made by the Commissioner of Internal Revenue upon classifying the receipts herein involved as ordinary income subject to an allowance for depletion. The Commissioner of Internal Revenue gave notice to each of the plaintiffs that their respective claims had been disallowed.

The land described in the Witte contract was acquired by J. A. Bel Lumber Co., Ltd., on August 8, 1906. On December 26, 1917, upon liquidation, this corporation transferred the land to its sole stockholder, John Albert Bel, now deceased, who was the grandfather of J. Albert Bel, one of the plaintiffs herein. All subsequent transfers have been transmittals by death. J. Albert Bel, Mrs. Ernest (Floy M.) Bel, Marie G. Garrison and Della B. Krause acquired their undivided interest in the land on or before the following dates:

| | |
|---|---|
| J. Albert Bel | May 7, 1934 |
| Mrs. Ernest (Floy M.) Bel | August 13, 1922 |
| Marie G. Garrison | August 26, 1950 |
| Della B. Krause | May 7, 1934 |

---

### Discussion

Decision of these cases turns on the construction of the contract of January 1, 1952. The Government would have us view the contract as a lease of the right to remove the sand and gravel with a reserve royalty payment. Taxpayers insist that the contract constituted a valid sale of the sand and gravel.

We turn to the provisions of the contract itself. It provides:

"For the consideration hereinafter set forth, Vendors do hereby grant, sell and convey unto Vendee, on the terms and conditions hereinafter set forth, 150,000 yards of gravel and 100,000 yards of sand in, on and under the following described property situated in Jefferson Davis Parish, Louisiana:

"NW¼, Section 22, Township 7 South, Range 6 West.

"Payment for the sand and gravel purchased by Vendee shall be made to Vendors by the execution by Vendee of twelve (12) promissory notes, each for one-twelfth (1/12) of the total consideration for this sale calculated at Ten (10¢) cents per yard for gravel and Five (5¢)

cents per yard for sand, the first of said notes to be payable two (2) months from date and the remaining notes to be due and payable monthly thereafter. Said notes shall bear interest at the rate of six (6%) per cent from their respective due dates but shall bear no interest from the date of execution to their respective due dates.

"It is contemplated that Vendee will remove monthly one-twelfth (1/12) of the amount of sand and gravel conveyed hereby and the maturity dates of the notes given in payment hereof are fixed accordingly. If, however, vendee removes in any one month an amount of sand and gravel the value of which equals the amount of two or more notes, the due date or dates of the notes maturing thirty days or more following the month of such removal will be accelerated to the end and that the maturity date of each note will never be later than thirty days following the end of the month in which Vendee has completed the removal of the amounts of gravel the value of which equals that part of the pur-

chase price represented by such note.

"The sand and gravel purchased by Vendee shall be removed by Vendee within a year from the date hereof. Prior to the end of each year reckoning from the date hereof for a total of Ten (10) years Vendee shall have the option to purchase all or any part of the sand and gravel yet unmined from the above-described land by paying Vendors for the unmined gravel which Vendee elects to purchase and remove during the following year that figure bearing the relation to Ten (10¢) cents (whether it be more or less than Ten cents) which the then net average price of gravel received at the pit bears to Two and 15/100 ($2.15) Dollars, and Vendee shall have the option to purchase all or any part of the unmined sand by paying Vendors for the unmined sand which Vendee elects to purchase and remove during the following year that figure bearing the relation to five (5¢) cents (whether it be more or less than five cents) which the then net average price of sand received at the pit bears to One and 65/100 ($1.65) Dollars. Except for the adjustments in price during each succeeding year, the terms and manner of payment and all other provisions with respect to Vendee's option for the first year shall be applicable to each succeeding year."

The contract then gives the vendee full rights of ingress and egress for the purpose of mining, storing and removing the gravel and sand. It permits Witte to place structures upon the land necessary to the mining of the gravel and to the use of underground water. Witte was required to conduct operations in such a manner that the lands would not be unduly damaged and it was agreed that under the terms of the contract Witte was required to restore the land to as nearly its present condition as possible after his mining operations were over. It was agreed by Witte that there would be left on such land no pits or lakes of an area of more than 40 acres. Witte could not obstruct the natural drainage of the lands and was required to conduct his operations so as not to spoil the streams or other bodies of water located in the vicinity of the land.

The agreement further provided full warranty of title on behalf of the plaintiffs and reserved the right on the part of the plaintiffs to conduct other operations such as the removal of timber and forest products and the right to explore and produce oil.

In a series of decisions beginning with Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489, the underlying principles governing the income tax consequences involving natural deposits have been set forth by the Supreme Court.[2] Under these decisions, notwithstanding the terminology of the contract, the transaction is to be considered a sale if the consideration is payable to the grantor without regard to the production and sale of the mineral. On the other hand, regardless of the wording of the contract where the consideration payable to grantor depends solely upon the extraction and sale of the mineral, the owner is said to retain an economic interest, and therefore his proceeds from the transaction are to be reported as regular income, subject under certain conditions to a deduction of a percentage depreciation allowance.

The United States Courts of Appeal for the Fifth, Ninth and Second Circuits have recently decided four (4) cases making concrete application of the general principles involved to sand and gravel questions. These cases are Crowell Land & Mineral Corp. v. Commissioner, 5 Cir., 242 F.2d 864; Gowans v.

2. Anderson v. Helvering, 310 U.S. 404, 60 S.Ct. 952, 84 L.Ed. 1277; Burton-Sutton Oil Company v. Commissioner, 328 U.S. 25, 66 S.Ct. 861, 90 L.Ed. 1062; Commissioner of Internal Revenue v. Southwest Exploration Company, 350 U.S. 308, 76 S.Ct. 395, 100 L.Ed. 347.

Commissioner, 9 Cir., 246 F.2d 448; Albritton v. Commissioner, 5 Cir., 248 F.2d 49; and Barker v. Commissioner, 2 Cir., 250 F.2d 195. In each case the Tax Court sustained the Government's contention that a sale of gravel in place is not to be recognized as such for income tax purposes where the vendor retains his fee interest in the land containing the deposit and received deferred payments. In each case except Albritton, the United States Appellate Courts reversed.

The facts in Barker and Gowans are stronger for the taxpayer than are the facts here.

In Gowans the deposit of sand which was the subject of the agreement was on a small tract of land in an urban area and the principal purpose of the land-owner was to have the sand excavated in order to make the parcel of land suitable as a building site. The buyer obligated himself to remove and pay for all of the sand at a fixed price, and there was a provision for monthly payment based on the amount of sand removed. The contract there referred to the parties as "buyer" and "sellers", but spoke of "royalty payments". The Ninth Circuit held that the transaction should be construed as a sale for tax purposes. In Barker [250 F.2d 197], the taxpayers executed a contract reciting that they sold the sand and gravel on their property. The contract called for an initial payment of $10,000, and six cents per cubic yard for the gravel extracted, but no less than $3,000 quarterly, regardless of the amount of material actually taken. The Vendee had the right to terminate the contract, upon notice, whenever in his judgment there remained no sand or gravel of the grade it was extracting. Otherwise, the agreement was to be in force fifteen years, and the Vendee had the right to extend it for another ten years. The Second Circuit found the transaction to be a sale of sand and gravel in place, and not a lease. It was the Court that said:

"In other words, we have a contract for the sale of sand and gravel for $190,000 to be paid over a 15-year period. This is nonetheless a sale because Mrs. Barker would be further benefited if Steers did not take any or all of the material to which it was entitled."

The facts here are *not* similar to those in Albritton [248 F.2d 50]. There, the Court, after referring to the contract involved, stated:

"From the quoted language it is apparent that it would be difficult to draft an instrument more completely embodying the language of a typical lease. The parties named themselves 'lessor' and 'lessee;' they called the income 'royalty,' using the word several times in the instrument; they provided for forfeiture if operations were suspended, and stated categorically that it was the intention of the parties that operations be commenced at the earliest practical time and carried on thereafter without undue interruption; and they stipulated that the lessors should derive income of a certain percentage of retail value of the sand and gravel removed during operations under the lease.

"It is clear, then, that the lessors retained an economic interest in the sand and gravel, conveyed to lessee only a royalty interest, derived income solely from exploitation, and called the cash payment 'advanced royalty.' It is manifest, therefore, under a long list of decisions that the amounts received by taxpayers from the extraction of sand and gravel from their lands were taxable as ordinary income."

The facts here are somewhat similar to those in Crowell. There, the contract recited that Crowell, as vendor, sold and conveyed, with full warranty of title, all sand and gravel underlying certain described property. Consideration was fifteen cents per cubic yard for all sand and gravel removed, payable $1,200 upon execution of the instrument and $1,200 at the beginning of each year that the contract was in effect as advance pay-

ment, with Gifford-Hill, vendee, having the privilege of removing without payment an amount of sand and gravel at fifteen cents per cubic yard equivalent to the advance cumulative payment. All material removed over and above the amount of the cumulative payment was to be paid for on the 20th of each month at the rate of fifteen cents per cubic yard. Failure of vendee to make any of the payments provided for cancellation and reconveyance to vendor. Vendee was given five years to remove. The Fifth Circuit reversed the Tax Court and held that the agreement constituted a bona fide sale. The Court, speaking through its Chief Judge, had this to say:

> "Neither the method of payment, based upon the amount of the deposit removed at specific intervals during the five (5) year period the Vendee had in which to effect removal, nor the provisions for reverter and retransfer can be regarded as indicia of or analogous to a mineral lease so as to permit the payments made by the Vendee under the sale contract to be regarded and treated as payments of royalty rather than, as they were intended to be and were, installment payments on the price." [242 F.2d 867]

Here, during the year 1952, Witte had no obligation other than to pay his promissory notes of $20,000. His only rights in that year were: (a) to remove the specified quantities of gravel and sand, and (b) to exercise his option to purchase additional quantities which he could remove in the following year. When Witte exercised his purchase option prior to the end of 1952, he gave his promissory notes in an amount determined by (a) the quantities he elected to buy, and (b) the "then" net average price received by him. In the following year, 1953, Witte had only the obligation to pay the promissory notes given for material previously bought. Witte's only rights, in the year 1953, were (a) to remove material for which he had previously issued his notes, and (b) to exercise an option to purchase still additional quantities which he would be permitted to remove in 1954. The same condition was applicable for each year thereafter during the period of ten years from January 1, 1952. The Bels' only rights were to collect Witte's promissory notes. Of course, Witte had no right to extract gravel or sand in the excess of quantities previously purchased pursuant to contract terms. Accordingly, at no time did the Bels have any right except to enforce Witte's fixed and personal liability as evidenced by his promissory notes.

The Government has called to our attention the fact that when Witte elected to exercise his option to increase the purchased quantities the price might vary from the unit price of the initial quantities. It is true that the taxpayers in Crowell, Gowans and Barker received a fixed price per cubic yard and that the lease in Albritton stipulated a royalty share of the lessee's retail price, but the crucial question is whether the consideration depends solely upon production and not how consideration is computed. Where, as in the instant case, the vendor holds the vendees' promissory notes in fixed amounts, the proceeds do not depend upon production but on the ability to collect the notes.[3] Here, too, it should be emphasized that taxpayer's receipts did not depend upon what Witte would receive for the product; instead, once each year the purchase price of additional quantities for the next year was determined by the "then" resale price of what Witte was selling from his previous purchase. This provision in the instant case was deliberately made by taxpayers to protect themselves against inflation.

---

3. In Albritton [248 F.2d 51] the Court, referring to Crowell, stated:

"Vendor was not to receive a percentage of the sale price, but a stipulated price per ton so that the amounts received by him did not depend upon the Vendee's income from the removal of gravel."

We agree with taxpayers in interpreting this remark to be for the purpose of illustrating that Crowell did not depend solely upon production.

The fact that future per cubic yard prices might vary each year depending upon the prices being received by Witte at the time he elected to increase the purchased quantities cannot be permitted to defeat the basic purpose of the transaction.

The United States earnestly insists that when the contract involved here is considered in its entirety it clearly is a lease with a minimum guarantee of the removal of 250,000 yards. We do not agree. Apparently, anticipating the possibility of the Court's disagreement with its principal contention, government counsel suggests that if, in fact, there was a sale here that it was only for 250,-000 yards to be removed the first year, and that this sale could apply only to the year 1952. From this it is argued "that the sale provision could have absolutely no bearing on 1953 taxes and the plaintiffs' claims for that year must fail, because all of the removals in that year were necessarily effected under the second provision of the instrument, which at best is no more than a mineral lease." We do not find the arguments of the government and the cases involving oil and gas mineral leases cited to be persuasive of this contention. Certainly the contract is to be construed as a whole and it matters not whether we look to the receipts from the original promissory notes or those given to cover an additional quantity under the annual option provision.

## Conclusion

We think that an analysis of the contract of sale completely rebuts the government's theory that the arrangement was merely one of lease, under which taxpayers retained an economic interest within the meaning of the cases cited and relied on. There was no provision in it for retention of a royalty as in oil and gas leases. A bona fide sale was the intent of the parties and it was expressed in terms free of ambiguity. Because of the combined facts and conclusions herein referred to, and believing as we do that Crowell sets out principles covering all situations in which the intent was bona fide and vendor's receipts do not depend solely on production, we find that the amounts received by each of the plaintiffs pursuant to the contract of sale represent capital gains from the sale of a capital asset, under Section 117 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 117.

The attention of the Court has been invited to the facts that the judgments, as plaintiffs would propose them in their brief, would provide for statutory interest at the rate of six (6%) percent per annum from the due date of each return for each respective year, whereas Section 2411 of 28 U.S.C.A. is explicit in its direction that in a suit for the recovery of taxes allegedly erroneously collected, the taxpayer can recover interest only from the date of the overpayment (which in this case was not March 15, 1953, or March 15, 1954 for any of the taxpayers) to a date not exceeding the date of the refund by more than thirty (30) days, such dates to be determined by the Commissioner of Internal Revenue. The dates of the overpayments are stipulated for each of the plaintiffs involved in this action in Paragraph 3 of the stipulation of facts filed with the Court.

The question of the proper amount of the judgment is left to the agreement of the parties upon recomputation, and if the parties are unable to agree, this Court will hold further hearings thereon.

Let there be judgment for petitioners in accordance herewith.