Robert WHITEHEAD and Clay J. Whitehead, Plaintiffs-Appellants,

v.

UNITED STATES of America, Defendant-Appellee.

No. 75–4253.

United States Court of Appeals, Fifth Circuit.

July 18, 1977.

C. O. McMillan, Stephenville, Tex., for Robert Whitehead.

Frank B. Appleman, R. Gordon Appleman, Ft. Worth, Tex., for Clay J. Whitehead.

Frank D. McCown, U.S. Atty., Fort Worth, Tex., Scott P. Crampton, Asst. Atty. Gen., Tax Div., Grant W. Wiprud, Atty., Gilbert E. Andrews, Acting Chief, Appellate Section, U.S. Dept. of Justice, Washington, D.C., for defendant-appellee.

Before GEWIN, RONEY and HILL, Circuit Judges.

GEWIN, Circuit Judge:

The issue in this case is whether certain transactions involving sand, gravel, and stone were sales or leases. Taking the view that the transactions were leases, the Internal Revenue Service ("the government") assessed additional taxes for the years 1969 and 1970.[1] The taxpayers, Robert and Clay J. Whitehead, paid the deficiencies, unsuccessfully filed claims for refund, and then brought this suit for refund in the total amount of $12,148.33 plus statutory interest. On stipulated facts and cross motions for summary judgment, the district court entered judgment in favor of the government, and the taxpayers appealed. We reverse.

The dispute arises out of two contracts which purport to sell specified quantities of sand, gravel, and stone in place to Lone Star Cement Corporation for a specified price, with the buyer having successive options to purchase 50,000 cubic yard increments of the deposits. Both transactions are structured in the same way, one involving a tract in Parker County owned by the taxpayers and another involving a tract in Hood County owned by taxpayers and their mother.[2]

The relevant stipulated facts can be summarized and the law discussed by reference to the Hood County tract. First the landowners granted the buyer an option to conduct tests to estimate the quantity of sand, gravel, and stone in place and to "purchase" 65 percent of the estimated deposits for fifteen cents per cubic yard. After conducting tests, the buyer exercised the option, "purchasing" 1,333,333⅓ cubic yards for a total price of $200,000.[3] By general warranty deed the landowners "conveyed" the purchased amount to the buyer but without specifying the location of the conveyed minerals within the tract.

The purchase price was payable $35,000 on closing and $35,000 on January 15, 1967, with the remaining balance of $130,000 payable in ten annual installments of $13,000 each beginning in November, 1968. The buyer paid the two $35,000 payments, as well as each annual payment of $13,000 prior to the stipulation of facts. The warranty deed retained a vendor's lien to secure the deferred payments. If in any contract year the purchaser removes and sells a quantity of material which when multiplied by fifteen cents per cubic yard exceeds the

1. Appellants reported the gain from the transactions as long-term capital gain. The government upon audit, however, viewed the amounts received as ordinary depletable income.

2. The parties agree that because of the similarities of the transactions our decision as to either transaction will control the tax treatment of both.

It should be noted that the government asserts in its brief that Robert and Clay Whitehead sued in their individual capacities "and as representatives of the estate of Jennie Whitehead," their mother.

3. The district court memorandum opinion and the parties' briefs are not consistent in their references to the basic quantity purchased. The parties and the district court sometimes use the figure 1,333,333⅓, but at other times use the figure 1,333,335. In addition, the district court opinion also contains a reference to "1,333,335–13" cubic yards. These inconsistencies apparently have no determinative significance for this opinion. We consider the original amount sold as 1,333,333⅓ cubic yards.

annual $13,000 payment, then the excess shall be paid to the sellers on the date of the next annual payment. Such additional payment must be applied to reduce the total $200,000 purchase price.

The buyer is not obligated to extract any material from the tract, and it had not done so when the facts were stipulated. When the buyer completely mines, removes, and sells 1,333,333⅓ cubic yards of sand, gravel, and stone from the tract, it has successive one year options to purchase an additional 50,000 cubic yards or more of the same material. Exercise of one option automatically creates another option for the same amount for the one-year beginning at the conclusion of the term during which the prior option was exercised.[4]

■ The general principles for deciding this case are well established. The transaction constitutes a mineral lease and not a sale if the landowner retains an "economic interest" in the minerals subject to the agreement. *Commissioner of Internal Revenue v. Southwest Exploration Company,* 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347, 354 (1956). To have retained such an interest the taxpayer must have: (1) "acquired, by investment, any interest in the oil [or other mineral] in place," and (2) secured by legal relationship "income derived from the extraction of the [mineral], to which he must look for a return of his capital." *Palmer v. Bender,* 287 U.S. 551, 557, 53 S.Ct. 225, 226, 77 L.Ed. 489, 493 (1933). The Treasury Regulations contain this test. *See* 26 C.F.R. § 1.611–1(b)(1). In the instant case, as in most such cases, the existence of the first element is admitted, and our focus turns to the second.

■ Whether a taxpayer has tied his return to the extraction of minerals does not turn merely on the subtleties of draftsmanship, the formal attributes or descriptive terminology of an instrument, or local law.

*Commissioner of Internal Revenue v. P. G. Lake, Inc.,* 356 U.S. 260, 266–67, 78 S.Ct. 691, 695–97, 2 L.Ed.2d 743, 749 (1958); *Palmer v. Bender, supra,* 287 U.S. at 555–56, 53 S.Ct. at 226, 77 L.Ed. at 492. Rather, the nature of the transaction depends on economic realities. *Rutledge v. United States,* 428 F.2d 347, 352–53 (5th Cir. 1970); *Wood v. United States,* 377 F.2d 300, 310 (5th Cir.), *cert. denied,* 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967).

The taxpayers principally rely on *Rhodes v. United States,* 464 F.2d 1307 (5th Cir. 1972). In *Rhodes* the taxpayers conveyed all clay deposits under one acre for $7500. In addition, the grantee agreed to purchase all acres with clay deposits in the 23-acre tract, taking conveyance of at least 2 acres each year, for $7500 per acre. Tests previously had shown that there were clay deposits beneath all 23 acres. Since there was a transfer of all clay deposits in the 23-acre tract at a fixed price (23 times $7500), the transaction was held to be a sale.

*Rhodes* therefore well illustrates what we said in *Vest v. Commissioner of Internal Revenue,* 481 F.2d 238, 243 (5th Cir.), *cert. denied,* 414 U.S. 1092, 94 S.Ct. 722, 38 L.Ed.2d 549 (1973):

.   .   . [A] sale results where an agreement purports to transfer within a prescribed time period *all,* or a *specific, predetermined* quantity of minerals in place, in exchange for a fixed consideration. The economic effect of an agreement exhibiting these terms is abundantly clear. Not only does the transferor part completely with his interest in the minerals in place, he also acquires a right to receive payments which is not dependent upon extraction by the transferee. (citations and footnotes omitted).

It is immediately apparent that the taxpayers' transfer of 1,333,333⅓ cubic yards of minerals for $200,000 was a sale as describ-

---

4. It was also stipulated that notwithstanding the option agreement the buyer can exercise an option within 30 days of a notice from the landowners of its failure to exercise the minimum option.

The agreement between the landowners and buyers also provided that the buyer can pay and discharge any tax liens against the premises and apply any payment made against the purchase price and against the next ensuing installment of the purchase price.

ed in *Vest.* The character of that sale for tax purposes, however, is complicated by the successive options also granted by taxpayers.[5] Consequently, *Rhodes* is not necessarily determinative here.

The government relies primarily on cases involving payments to transferors based on a percentage of the market value of minerals [6] extracted [7] or a fixed amount per cubic yard of minerals extracted,[8] sometimes with minimum payments required. In a sense these cases are relevant, because the method of payment in each suggested a "fixed price" for a sale of a "fixed amount," though the amount involved was a basic unit of measurement. Courts in these cases have found such transactions to be in the nature of mineral leases since the transferors received royalty payments tied to total extraction. But the government has not cited, nor have we found, a court of appeals or Supreme Court case holding that a sale of substantial mineral deposits at a fixed price is converted into a lease by options for further purchases.

The district court concluded that the instant transaction was a lease, reasoning that "[t]he only factor which is certain is that the taxpayers will receive a minimum guaranteed payment for 65% of the material, and 15 cents per cubic yard for the amount of remaining material Lone Star finds profitable to extract." In reaching this conclusion the court relied on its prior decision in *Filgo v. United States,* 387 F.Supp. 1300 (N.D.Tex.1974). In *Filgo* the taxpayers purported to "sell" 25,000 cubic yards of sand and gravel for $25,000 and also granted the buyer annual options to purchase additional increments of 25,000 cubic yards for $6,250 per increment. Significantly, the agreement contained a proviso that should the buyer estimate that less than 25,000 cubic yards remain in the tract, the buyer could purchase the remaining deposits for 25 cents per cubic yard. The court concluded that this agreement gave the buyer the right to mine sand and gravel from the tract to exhaustion over an indefinite period. *Id.* at 1304.[9]

---

**5.** Government counsel at oral argument conceded that without the options the instant transactions were true sales for tax purposes.

**6.** Throughout this opinion we use the word "minerals" in a broad, general sense to refer to numerous types of deposits.

**7.** *E.g., Vest v. Commissioner of Internal Revenue, supra* (payments calculated as a percentage of the buyer's receipts from sales of subsurface water); *United States v. White,* 401 F.2d 610 (10th Cir. 1968) (en banc) (initial lump sum payment of $175,000, plus 10% of the gross market value of minerals removed and sold); *Commissioner of Internal Revenue v. Pickard,* 401 F.2d 615 (10th Cir. 1968) (en banc) ($172,800 payment for options; if options were exercised, taxpayer to receive 5% of the market value of gas and oil produced); *Albritton v. Commissioner of Internal Revenue,* 248 F.2d 49 (5th Cir. 1957) ($200 minimum monthly payments plus percentages of the extracted minerals' market values).

The government also relies on *Palmer v. Bender, supra,* and *Burnet v. Harmel,* 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932). Those cases involved transfers of oil and gas rights, with payment in the form of an immediate cash bonus and a percentage of oil and gas production. Those cases do not help the government here, since there was only one transfer in each case with two modes of payment. Obviously

the tax treatment of the modes of payment should depend on the character of the single underlying transaction. *See* note 12 *infra.*

**8.** *E.g., Hartman Tobacco Co. v. United States,* 471 F.2d 1327 (2d Cir. 1973) (en banc) (minimum annual payments of $15,000 plus 23 cents per cubic yard of sand and gravel extracted); *Rutledge v. United States, supra* (minimum monthly payments plus fixed amount per cubic yard extracted); *Wood v. United States, supra* (minimum annual payments of $15,000 plus 25 cents per cubic yard mined and removed).

**9.** Somewhat similar to *Filgo* is *Bel v. United States,* 160 F.Supp. 360 (W.D.La.1958). There the taxpayers sold 150,000 yards of gravel and 100,000 yards of sand for a fixed price, extraction to occur during the next year. Following this initial extraction the "buyer" had successive annual options to purchase and remove all or any part of the remaining minerals at a price per unit removed related to the market price. The court reasoned that the vendors' receipts were not dependent on production and held that the taxpayers retained no economic interest.

Contrary to the taxpayers' assertion here, we did not "approve" *Bel* in *Wood v. United States, supra,* 377 F.2d at 306 n.16. There we simply cited *Bel* for the proposition that the phrase "dependent on production" refers to

From *Filgo* and the cases relied on by the parties there is seen a continuum in mineral "sales," ranging from multiple "sales" of a basic unit of measurement (for example, one cubic yard of sand for 20 cents) to a sale of all the deposits of a certain mineral on a particular tract for a fixed price. *Filgo* and the instant case appear to be in between the two extremes.

■ The government seems to argue that a purported sale of minerals is a lease if it is possible that the same buyer could make additional purchases of the same mineral from the same tract. Logically extended, this means the government would contend that the sale of the 1,333,333⅓ cubic yards in the instant case is a lease without regard to the options, since it is possible that the taxpayers subsequently may sell the remaining sand, gravel, and stone to the buyer. Perhaps the government would stop short of this extension, arguing that it is the coincidence of the original sale and the granting of the options that is crucial. We fail to see the logic of this distinction.[10]

We need not resolve all possible cases, and in particular we need not determine whether *Filgo* was properly decided. It was not appealed and is not before us. We conclude that where, as here, there has been a sale of a substantial quantity of minerals constituting a substantial percentage of the total deposits in a tract for a fixed price with no obligation to extract, the transfer has sufficient significance, independent of the options, to be treated as a sale of minerals.[11] The decision by the buyer to extract the 1,333,333⅓ cubic yards will probably depend on the economic feasibility of extracting that amount. In addition, such an amount cannot be extracted overnight; the decision to exercise an option will be affected greatly by changes in market conditions occurring while the purchased minerals are being extracted. Moreover, the buyer in extracting its 1,333,333⅓ cubic yards is likely to take that which is easiest to mine. Different economic judgments will enter into the decisions to exercise the options.

Therefore, we conclude that the sale of 1,333,333⅓ cubic yards of sand, gravel, and stone for $200,000 and the Parker County sale were sales in substance as well as in form. The taxpayers "cashed in" a sizable, definite investment interest in each instance, and capital gain treatment of the proceeds is appropriate. *Vest v. Commissioner of Internal Revenue, supra,* 481 F.2d at 243.[12]

REVERSED and REMANDED.

provisions tying receipts to the number of units extracted as well as to provisions tying receipts to the market price of the minerals extracted.

10. Had the taxpayers not granted the options in the instant case, the sale of 65% of the deposits may have made the buyer the most likely purchaser of the remaining deposits. For example, if the taxpayers sought bids on the remainder when the buyer had nearly completed extraction of its original purchase, it might well be willing to make the highest bid since its equipment would be in place and its workers would have experience with any unique problems at that jobsite.

11. *Accord,* Don C. Day, 54 T.C. 1417, [1970 Transfer Binder] Tax Ct. Rep. (CCH) Dec. 30,-210 (1970). In *Day* the taxpayers conveyed subsurface water rights for a term of 25 years for $56,000, with the buyer having an option to renew the agreement for 20 years upon tender of an additional $80,000. The Tax Court concluded that the initial $56,000 sum was derived from a sale, saying in part:

Under these contracts [the buyer] acquired the right to *all* of the water underlying petitioners' lands; it intended to withdraw that water, and, under the peculiar facts, could do so within the stated 25- or 45-year periods. The amount of the consideration paid at the time the contracts were signed, was fixed by the terms thereof and was in no way dependent on the fact or amount of the future production or extraction of the water.

The existence of the 20-year option did not disqualify the initial payment for sale treatment, since it was quite possible that the buyer would extract all of the subsurface water during the initial 25-year term. Similarly, it should be noted that in the instant case the initial sales were based on estimates of the total deposits. It is quite possible that there are only about 1,333,333⅓ cubic yards of sand, gravel, and stone of acceptable quality to the buyer in the Hood County tract. This and other factors noted in the text indicate the independent significance of the initial sales.

12. In so holding we are quite aware of the Tenth Circuit's dilemma in *White v. United States,* 401 F.2d 610 (10th Cir. 1968) (en banc), because of its earlier holding in *United States*

*v: White*, 311 F.2d 399 (10th Cir. 1962). Both cases involved the same transaction—the taxpayers' transfer of mineral rights in certain land in exchange for an initial lump sum payment of $175,000 and a royalty of 10% of the gross market value of the minerals extracted. In *White I* the court considered the tax treatment of the lump sum. It held that so far as the sum was concerned, the taxpayers retained no economic interest in the minerals and that the payment should therefore receive capital gains treatment.

In *White II* the court en banc, in considering the tax treatment of the royalty payments, overruled *White I*, stating that the court in *White I* should not have broken down the transaction into parts.

Our holding avoids the *White* problem because we conclude that the sales of minerals in the two tracts must be viewed as transactions separate from the options. Therefore, the instant decision leaves open the tax treatment of any payments received upon exercise of the options. The first option cannot be exercised until the purchased materials have been extracted. Exercise of the first option on each tract may have little significance independent of the other options. Accordingly, the options as a whole might be similar to the *Filgo* transaction. As noted before, however, we express no view as to the correctness of *Filgo*.

To consider the sale and options (on each tract) here as two separate transactions, however, does not lead to the *White* problems, since in *White* there was *one transfer* of all mineral rights with *two modes of payment*. The court in *White II* realized it had erred in considering the two modes separately when they arose from only one transaction. If this court should ever consider the tax consequences of payments received upon exercise of the instant options, it would not be incongruous for it to hold that the successive options themselves constitute lease transactions. Moreover, under our decision here it would be free to hold otherwise.