**William S. RHODES and Sara G. Rhodes, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

**Spears R. RHODES and Martha Jane Rhodes, Plaintiffs-Appellants,**

v.

**UNITED STATES of America, Defendant-Appellee.**

Nos. 71–3215, 71–3216.

United States Court of Appeals, Fifth Circuit.

Aug. 14, 1972.

**1308**

Hobart A. McWhorter, Jr., Lee C. Bradley, Jr., Bradley, Arant, Rose & White, Birmingham, Ala., for plaintiffs-appellants.

Ira De Ment, U. S. Atty., Montgomery, Ala., Fred B. Ugast, Acting Asst. Atty. Gen., Meyer Rothwacks, Atty., Scott P. Crampton, Asst. Atty. Gen., Virginia H. Gallagher, Richard W. Perkins, Virginia M. Hopkinson, Attys., Tax Div., Dept. of Justice, Washington, D. C., for defendant-appellee.

Before WISDOM and INGRAHAM, Circuit Judges, and BOOTLE, District Judge.

BOOTLE, District Judge:

These consolidated appeals require us to determine the proper tax treatment of income received by taxpayers under a contract with their wholly owned corporation, Excelsior Brick Company, Inc., disposing of brick clay deposits on a tract of taxpayers' land. The issue presented is whether the contract was in essence a sale of minerals in place or a mineral lease. If a sale, as contended by taxpayers, the payments they received constituted proceeds from the sale of a capital asset and were taxable as capital gain. If the transaction was a lease agreement, as contended for by the Commissioner of Internal Revenue, the payments were taxable as ordinary income subject to an allowance for depletion.

Taxpayers filed suits in the district court seeking refund of income taxes assessed against them by the Commissioner following the Commissioner's disallowance of their claim for capital gains treatment of sums received by them in the years 1964 and 1965 from the disposal of their mineral interests. The actions were consolidated for trial along with the suit of Excelsior Brick Company seeking recovery of taxes assessed against it by the Commissioner.[1] The case was tried to a jury, which answered special interrogatories placing the value of the clay deposits at a figure less than that contended for by taxpayers but more than that insisted upon by the Commissioner and denoting the transfer of the clay deposits to Excelsior by taxpayers as a lease rather than a sale. The court entered judgment on the jury verdicts. Taxpayers subsequently filed a motion for judgment notwithstanding the verdict or in the alternative for a new trial. The motion was denied by the court. Excelsior did not appeal the jury's determination of the fair market value of the deposits, nor do the parties here challenge such determination.

We conclude that the payments taxpayers received for the transfer of the clay deposits were returns from the sale of capital assets and should have been taxed as capital gains. The trial court should have granted the motion for judgment notwithstanding the verdict. Accordingly, we reverse.

In July of 1959, taxpayers purchased about 23 acres of land from Mrs. Martha Henry Stay (hereinafter referred to as the "Stay" tract) for some $55,000.00 or roughly $2300.00 an acre. This tract was adjacent to the Excelsior Brick Plant. Exploration of the tract by tax-

---

1. The Commissioner assessed additional taxes against Excelsior contending that the depletion allowance deducted for the years 1964 and 1965 was excessive because the purchase price used as the basis for the deduction was excessive, the true value of the land being far less than the price actually paid by the corporation to its sole stockholders. The Commissioner also ruled that the excess constituted dividends to taxpayers.

payers indicated extensive clay deposits underlying the tract for an average depth of 20 feet. Additionally, the taxpayers determined that substantial sand and gravel deposits lay under the clay deposits.

In 1962, taxpayers and Excelsior, with Spears Rhodes as president and William Rhodes as vice-president, entered into an agreement termed an "indenture" whereby taxpayers, as "grantors", purported to "grant, bargain, sell, assign, convey, transfer and set over unto" Excelsior, as grantee, "in fee simple", all of the "merchantable brick clay" deposits underlying a specifically designated and described one acre parcel of the Stay tract, the purchase price being $7500.00. In pertinent part the provisions of the indenture were as follows. The grantee was to mine and remove the clay in a progressive and orderly fashion so as not to impair the availability or value of surrounding land, or increase the cost of removing other clay and the sand and gravel deposits. A 15 year period was allocated to effect the removal. If all of the merchantable clay was not removed in 15 years grantors had the option of removing the clay and selling it for the account of the grantee, any excess of payment received for the clay above expense of extraction to be paid to grantee. If, however, the payment received for any clay so removed was less than the cost of removal, the difference was to be a debt of the grantee. Merchantable clay was defined in the instrument as clay which can be economically removed at a net profit as of the date of the execution of the instrument. It was provided though that if any clay which was merchantable on that date later becomes unmerchantable in fact, or in the opinion of the grantee, grantee, in lieu of removing same, or having same removed at its expense after 15 years by grantor, may reconvey same to grantors who may accept such reconveyance in lieu of exercising their option to remove it at grantee's expense. Further, grantee agreed to remove the clay in a proper and workmanlike manner according to the best practices pursued by skilled operators in the business of mining. Rights of ingress and egress were guaranteed grantee over other lands of grantors.

The indenture, in addition to transferring all the merchantable clay on the one acre parcel contained a contract for the sale of all merchantable clay contained on the entire tract. Stating that Excelsior desired "to acquire all such deposits (merchantable clay deposits) of brick clay as and when the same may be used in its business of making brick, and the grantee (Excelsior) may have the financial resources with which to pay for the same in full", the instrument provided that the "Grantors do hereby agree to sell unto the Grantee, and the Grantee does hereby agree to purchase from the Grantors, all of the merchantable brick clay deposits" which were located under the remainder of the Stay tract, at the rate of $7500.00 per acre, with the proviso that if portions of the tract contained no merchantable brick clay deposits, those portions were to be excluded from the portions to be sold. The parties to the indenture expressly contracted that merchantable brick clay deposits were located on not less than five additional acres of the Stay tract which five acres would yield not less than $37,500.00 in addition to the one acre which was conveyed by the instrument and grantee agreed to pay not less than said sum subject to the terms and conditions of the indenture. A procedure was set out by which grantee could require grantors to convey all of the merchantable brick clay located under the remaining part of the Stay tract in two acre parcels, under the same provisions contained in that part of the indenture conveying the one acre tract. If Excelsior did not call for the conveyance of at least two acres per year, beginning in 1963, taxpayers could require Excelsior to accept the conveyance of a two acre tract in each year at the specified price. If payment for the parcels so conveyed was not forthcoming, grantors could reserve a vendor's lien upon

said parcels to secure any unpaid purchase money.[2] The only limitation on Excelsior's right to require further conveyances was that Excelsior pursue its business of removing brick clay from all portions of the larger tract in an orderly way and in general conformity with certain provisions of the indenture which, inter alia, required Excelsior to remove the clay in a workmanlike manner and "in such a manner as will not unnecessarily disturb the surface of related or contiguous areas, or unreasonably impair the availability or value of the land surrounding the same for the future uses and purposes of the Grantors, especially for the removal of sand and gravel."

Following the execution of this indenture by subsequent deeds containing provisions with respect to the land transferred thereby essentially the same as those which were contained in the original indenture, nine additional two acre tracts were transferred by taxpayers to Excelsior and payments made as follows:

| "Date of Deed | Acreage Involved | Amount Paid to Taxpayers |
|---|---|---|
| March 20, 1963 | 2 | $15,000 |
| February 24, 1964 | 2 | 15,000 |
| September 24, 1964 | 2 | 15,000 |
| March 24, 1965 | 2 | 15,000 |
| December 6, 1965 | 2 | 15,000 |
| December 14, 1966 | 2 | 15,000 |
| March 29, 1968 | 2 | 15,000 |
| March 24, 1969 | 2 | 15,000 |
| March 23, 1970 | 2 | 15,000." |

In transactions of this type, to determine whether the purported transfer was a sale of minerals in place or a mineral lease, it must be determined whether taxpayers, pursuant to the contract between the parties, retained an economic interest in the minerals and in determining whether an economic interest was retained "the critical consideration is whether payment is dependent upon extraction. . . ." Rutledge v. United States, 428 F.2d 347 (5 Cir. 1970); Wood v. United States, 377 F.2d 300 (5 Cir.1967). If such an interest has been retained the transaction was a mineral lease and not a sale of minerals in place. *Wood, supra.* An economic interest exists where a taxpayer has "(1) 'acquired, by investment, any interest in . . . , (the minerals) in place,' and (2) secured by legal relationship 'income derived from the *extraction* of . . . (the mineral), to which he must look for a return of his capital.'" C.I.R. v. Southwest Explor. Co., 350 U.S. 308, 314, 76 S.Ct. 395, 398, 100 L.Ed. 347, 353 (1956). (Emphasis added).

A number of cases nationwide have dealt with this question, but as Judge Thornberry in *Wood* recognized, the law in this circuit is controlled by Crowell Land & Mineral Corp. v. C.I.R., 242 F.2d 864 (5 Cir.1957) (transaction found to be a sale of minerals in place); and Albritton v. C.I.R., 248 F.2d 49 (5 Cir. 1957) (holding contract to be a mineral lease). *Wood,* of course, must now be added to this list as must *Rutledge* (both cases involving mineral leases rather than mineral sales). In view of the excellent analysis of mineral cases from many circuits by Judge Thornberry in *Wood,* we shall not replow that ground, confident that the case at bar is controlled by *Crowell* and readily distinguishable from *Albritton, Wood* and *Rutledge* and indeed from many other "lease" cases analyzed by Judge Thornberry in *Wood,* including Rabiner v. Bacon, 373 F.2d 537 (8 Cir.1967); Freund v. United States, 367 F.2d 776 (7 Cir. 1966), and Laudenslager v. C.I.R., 305 F.2d 686 (3 Cir.1962), and is in line with the "sale" cases analyzed by Judge Thornberry, which include Linehan v. C.I.R., 297 F.2d 276 (1 Cir.1961); Barker v. Commissioner of Internal Revenue, 250 F.2d 195 (2 Cir.1957) and Go-

---

2. Although the contract provided for a minimum purchase each year no maximum was set. Excelsior presumably could call for any number of two acre tracts in any given year, and, as the record indicates, did so in both 1964 and 1965 purchasing in each year two two-acre tracts.

wans v. Commissioner of Internal Revenue, 246 F.2d 448 (9 Cir.1957).

The contract itself for the transfer of the merchantable clay deposits on the entire Stay tract clearly contemplated a sale of the deposits and not a lease. It provided that the grantors "grant, bargain, sell, assign, convey, transfer and set over unto" Excelsior, as grantee, in *fee simple,* all of the merchantable brick clay deposits.[3] The contract obligated grantors to convey the deposits in two acre tracts as called for by the grantee, with a requirement that the grantee call for at least one such tract each year. The purchase price for each tract was set at $15,000.00 and it was to be paid at the time of conveyance. Before the sale was effectuated the Stay tract had been examined and it had been determined that the brick clay deposits extended over the entire tract to an average depth of 20 feet. Thus, Excelsior was purchasing a given number of acres of merchantable clay deposits, which deposits lay to a depth of 20 feet. But the purchase price was not dependent on the extraction, nor was there any guaranty of the presence of any specified quantity of clay on any particular tract. Excelsior was required to mine all of the merchantable clay, the contract indicating that taxpayers looked toward the mining of considerable sand and gravel deposits underlying the clay once the clay was removed. And no additional payments were provided for dependent upon the quantity of clay removed.

■■■ Contract provisions such as these are indicative of a sale of minerals in place. In *Wood,* Judge Thornberry in discussing the "sale" cases noted that:

"In Linehan v. Commissioner of Internal Revenue and Gowans v. Commissioner of Internal Revenue the courts were influenced by the fact that preparation of the land for another use, not extraction of the minerals, was the primary motive of the landowners' action in entering into the contracts covering the minerals. The courts in the same two cases were influenced by a requirement in the respective agreements that all of the minerals covered by the contracts be removed.[27] In

27. The Tax Court has also viewed a requirement that all sand and gravel be removed as indicative of a sale. Robert M. Dann, 1958, 30 T.C. 499.

United States v. White, [10 Cir., 311 F.2d 399] the court felt that a large down payment in no way tied to extraction was indicative of a sale. In Barker v. Commissioner of Internal Revenue, Gowans v. Commissioner of Internal Revenue, United States v. White, and Crowell Land & Mineral Corp. v. Commissioner of Internal Revenue, the deciding courts were strongly influenced by the fact that the respective agreements were couched in terms of absolute conveyances or contracts of sale." 377 F.2d at 311.

The close similarity between the essential terms of this contract and the essential terms of those discussed in the "sale" cases analyzed by Judge Thornberry is obvious.[4]

Judge Cameron, in *Albritton,* speaking of the *Crowell* decision, stated that "construing the instrument as a whole and considering it against the total background of transactions under it, the contract was one of sale." 248 F.2d at

---

3. Cases previously cited demonstrate that our tax laws recognize the validity of a sale of mineral deposits in place without the sale of the land underlying the deposit.

4. We do not overlook the fact that labels or words used by the parties in forming their contract are not controlling. We recognize also that substance prevails over form. *Rutledge, supra.* However,

where the words and form of the contract clearly indicate that no economic interest is retained no retention can be found absent other persuasive factors. The Commissioner insists that the relationship of the parties be looked to for this purpose. But, as will be discussed *infra,* this relationship, while subjecting the transaction to close scrutiny, does not in and of itself tip the scales.

51. By analyzing the entire series of subsequent transactions pursuant to the "indenture" in the case at bar, it is readily apparent that the parties remained faithful to the terms of the agreement. We find no evidence to indicate that despite the terms of the agreement either contemporaneously with or subsequent to its execution, the parties' true intent was to create what our tax laws recognize as a mineral lease. The indenture called for the conveyances of the deposits in two acre tracts for a consideration of $15,000.00 per tract. Through 1970, nine such tracts had been conveyed and the stated consideration paid. It does not appear that any additional consideration was ever contemplated or paid.

In contrast, the courts in *Albritton, Wood,* and *Rutledge* were confronted with clearly different circumstances. In *Albritton* and *Wood,* the instrument was entitled a lease and the language used bespoke a lease. The *Rutledge* instrument utilized the language of sale; however, the court found that other factors belied such language. In each case payment was either a percentage of the retail sales value (*Albritton*) or a set amount per cubic yard of mineral removed (*Wood* and *Rutledge*) to be paid periodically throughout the life of the agreement, with a guaranteed minimum monthly royalty, payable in advance. The parties to these agreements did not make an advance determination of the quantity of minerals in place, making the payment for them correspond to the quantity so determined to be present. These factors this court determined were persuasive in characterizing the transactions as mineral leases rather than sales of minerals in place.

The government would go beyond the language and form of the contractual arrangements between the parties in determining whether payments called for by the contract are dependent upon extraction of the clay, looking to economic realities for this purpose. In this regard the government points out that the contract in question was between tax-payers and their wholly owned corporation; and that the transaction merits close scrutiny to determine whether the economic realities of the situation are such as to warrant a finding that payments were dependent on extraction. The government, however, does not suggest that because of the relationship taxpayers would under no circumstances be able to sell to their own corporation and take advantage of the capital gains provisions of our tax laws.

██ Of course a taxpayer is free to negotiate a contract with an intent to avoid or minimize taxes, although he cannot resort to a mere subterfuge. Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 79 L.Ed. 596, 599; Commissioner of Int. Rev. v. Tower, 327 U.S. 280, 66 S.Ct. 532, 90 L.Ed. 670; Blackstone Realty Co. v. C.I.R., 398 F.2d 991 (5 Cir.1968). Clearly, transactions between a family corporation and its shareholders are subject to special scrutiny, Dillin v. United States, 433 F.2d 1097 (5 Cir.1970), but are not *ipso facto* void or impermissible.

██ Although taxpayers sold the clay deposits to their wholly owned corporation, we find nothing in the record to indicate that their relationship to the corporation made payment dependent on extraction. Certainly the fact of the relationship alone does not, nor does the "indenture". Further, the actions of the parties both prior to and subsequent to the execution of the "indenture" do not demonstrate that payments for the clay deposits were to be dependent on extraction. Where the contract on its face clearly divorces payments from extraction, and where nothing else indicates the dependence of the former upon the latter, the mere relationship of the parties *inter sese* cannot supply the necessary relationship between payments and extraction.

██ We conclude that measured by the criteria prescribed by Boeing Company v. Shipman, 411 F.2d 365 (5 Cir. 1969), the jury was unauthorized to find that the transaction under scrutiny con-

stituted a lease rather than a sale and that the district court erred in not granting judgment for the plaintiffs notwithstanding the verdict.

We reverse and remand with direction that judgment be rendered for the plaintiffs on the capital gains issue notwithstanding the verdict.