VERLUS H. REAGAN AND ALMA LYONS REAGAN, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent ODIS COWART AND EUDORA B. COWART, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Reagan v. Commissioner
Docket Nos. 5078-71, 5123-71.
United States Tax Court
T.C. Memo 1973-266; 1973 Tax Ct. Memo LEXIS 21; 32 T.C.M. (CCH) 1255; T.C.M. (RIA) 73266; December 5, 1973, Filed Louis O. Gravely, Jr., and Thomas C. O'Bannon, for the Petitioners. Kenneth B. Wheeler, for the respondent. FAY
MEMORANDUM OPINION FAY, Judge: Respondent determined deficiencies in the Federal income taxes of petitioners for the designated years in the following amounts: 2 Docket No.
Petitioner
Year
Deficiency 5078-71
Verlus H. Reagan and Alma Lyons Reagan
1967
$ 7,591.00
1968
10,935.00
1969
9,162.00
5123-71
Odis Cowart and Eudora B. Cowart
1967
$10,894.89
1968
7,463.83
1969
9,414.25
*22 These cases were consolidated on a joint motion of all the parties because of their common issues of law and fact. There being no dispute as to the facts of these cases, they were fully stipulated and submitted to this Court under Rule 30 of the Tax Court's Rules of Practice.
Due to concessions, the primary issue remaining for decision is whether the petitioners have sold the limerock on their property thereby realizing capital gain, [1] or have retained an economic interest in the limerock, to which they must look for payment, thereby realizing ordinary income on the receipts. If the latter, we must then determine the proper percentage depletion rate available to petitioners for limerock used for road construction purposes. [2]
All of the facts have been stipulated and are found accordingly. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. 3 Petitioners *23 Verlus H. Reagan (Verlus) and Alma Lyons Reagan (Alma) are husband and wife and maintained their residence in Boca Raton, Florida, when the petition herein was filed. They filed joint income tax returns for the taxable years 1967, 1968 and 1969 with the Office of the Director, Southeast Internal Revenue Service Center, Chamblee, Georgia. Petitioners Odis Cowart (Odis) and Eudora B. Cowart (Eudora) are husband and wife and resided in Center Hill, Florida, at the time they filed the petition in this case. They filed joint income tax returns for the taxable years 1967, 1968 and 1969 with the Office of the Director, Southeast Internal Revenue Service Center, Chamblee, Georgia. Eudora and Alma are sisters. Sometime prior to January 1, 1963, they purchased approximately 1,000 acres of land located in Sumter County, Florida, which thereafter they operated as a partnership. On November 25, 1963, Odis and Eudora and Verlus and Alma, designated as "Sellers," together with Dixie Lime and Stone Company (Dixie), designated as "Buyer," executed an agreement with respect to the aforementioned land entitled "Option Sales Agreement" (hereinafter sometimes referred to as the agreement or *24 the contract). The agreement provided for Dixie to conduct geological tests on the land for the purpose of determining the existence of calcareous materials. If in Dixie's judgment sufficient 4 quantities of such materials existed to make commercial development feasible, the agreement stated that Dixie wished to purchase all such materials in place. It was further provided that Dixie would have the right to make exploration for a period of 60 days and would have an option to purchase all of the limerock lying on or under the surface. If the option was exercised, the parties agreed that Dixie was not to be limited in time for removal of the material. Payment for the limerock was provided as follows: Agricultural
8" per ton removed for use as agricultural rock, plus 15% of the current average sales price exceeding $2.60 per ton
Road Materials
8" per ton removed for use as road materials, plus 15% of the amount the current average sales price exceeds $1.10 per ton
All Other
10" per ton removed for all other uses, plus 15% of the amount by which the current average sales price exceeds $1.10 per ton
Petitioners were to be paid a "minimum yearly guaranteed *25 payment" of not less than $10,000 per contract year. The provision reads as follows: [3]
6. The purchase price for such limerock shall be paid by Buyer to Sellers at the rate of not less than Ten Thousand Dollars ($10,000.00), hereinafter referred to as the "minimum yearly guaranteed payment", for each "contract year" (which is defined 5 as commencing on April 9th of each year hereafter) beginning with the year 1964-1965. The balance of minimum yearly guaranteed payment due in any given contract year shall be payable up to the sum of $500.00 on the first day thereof, with the balance, if any, due and payable on or before the last day thereof. Any payments made in accordance with the provisions of paragraph four (4) [reciting the per tonnage payment schedule] supra, during each contract year, shall be credited towards the minimum yearly guaranteed payment for such contract year only; and any such payments made in excess of the unpaid balance of the minimum yearly guaranteed payment shall be considered and treated as payment for limerock mined *26 and removed during such contract year only, and not as cumulative or advance payments upon future minimum yearly guaranteed payments. The payment of various taxes was arranged. Petitioners were to pay all ad valorem taxes [4] and Dixie was to pay all mining taxes, severance taxes, or other taxes in connection with the mining and removal of the material. The agreement provided Dixie with the right to unilaterally terminate its contract obligations. If terminated, the title to the limerock remaining on the land reverted to the petitioners absolutely. Specific to Dixie's right to terminate are the following provisions: 3. The right of Buyer to go upon said tract, and to mine and remove limerock in accordance with the terms hereof, shall not be limited in time, but Buyer agrees that when it shall have removed from said tract all the limerock which Buyer deems practicable to remove, or which Buyer desires to remove, the Buyer shall so notify Sellers in writing, and all Buyer's right, title, interest *27 and estate in and to said limerock, and in and about said tract, 6 and all Buyer's obligations hereunder, shall thereupon terminate forthwith and absolutely. In case any limerock shall remain on said tract at the time of giving such notice, title to such remaining limerock shall revert and belong to the Sellers absolutely; and the Buyer agrees that, if so requested in writing by the Sellers, it will execute and deliver to the Sellers an appropriate instrument releasing and quit-claiming to Sellers all of such remaining materials. * * * 24. Notwithstanding all contrary provisions of this agreement, and of all other agreements or undertakings by or between the parties hereto, Buyer may at any time hereafter tender to Sellers a deed of conveyance to said tract and to the minerals thereon and therein, with full warranty as against persons claiming the same by, through or under Buyer, and all duties, obligations or responsibilities of Buyer hereunder shall thereupon terminate forthwith, and Buyer shall be released by Sellers therefrom absolutely. Petitioners were provided with a means of terminating the contract only if there was a default in performance by Dixie of any of *28 its obligations under the agreement. If terminated, all unmined limerock became the property of the petitioners. Pursuant to Dixie's exercise of the option, on February 1, 1964, petitioners executed a limerock deed to Dixie. The deed was recorded in the records of Sumter County, Florida, and the appropriate Florida documentary stamps were affixed. During the years in question Dixie purchased the following amounts of limerock pursuant to the agreement (units expressed in tonnage): Year
Road Construction
Quick Lime
Agricultural Lime 1967
1,201,710
113,754
139,185
1968
744,137
113,043
185,433
1969
623,658
41,714
185,852 7 Irrespective of use, the limerock mined was of uniform quality, capable of furnishing any of the above three markets. In each of the three years 1967, 1968 and 1969 petitioners reported the proceeds from the limerock as long-term capital gain. In his notices of deficiency respondent determined that the amounts received by petitioners under the agreement with Dixie were ordinary income rather than gain from the sale of capital assets. We will consider first the frequently litigated issue of whether the income *29 realized by a landowner incident to the extraction of a mineral deposit should be characterized as capital gain or ordinary income. A determination of the issue is dependent upon whether petitioners have retained an economic interest in the minerals. A transfer of mineral rights that amounts to a sale of the minerals "in place" warrants that the gain, reflected in the proceeds received, be taxed at the capital gain rates. See Rhodes v. United States, 464 F.2d 1307 (C.A. 5, 1972); and Wayman A. Collins, 56 T.C. 1074 (1971). Conversely, a transfer of mineral rights where the transferor retains an economic interest in the minerals has been characterized as being more in the nature of a mineral lease rather than a sale, and the amounts received taxed as ordinary income. See Rutledge v. United States, 428 F.2d 347 (C.A. 5, 1970); Wood v. United States, 377 F.2d 300 (C.A. 5, 1967); Ollie G. Rose, 56 T.C. 185 (1971). An economic interest has been retained where a taxpayer 8 has (1) acquired by investment an interest in the mineral in place and (2) then looks to the extraction of the mineral for the return of his capital. *30 Commissioner v. Southwest Expl. Co., 350 U.S. 308 (1956); Palmer v. Bender, 287 U.S. 551 (1933); Wood v. United States, supra. The controversy before us concerns the second part of this test. Petitioners argue that they have divested themselves of any interest in the minerals. Respondent, on the other hand, maintains that petitioners must look to the extraction of the limerock for their proceeds, thereby retaining an economic interest in the minerals. We agree with respondent's analysis. The contract in question here is couched in the terms of a conveyance. The agreement is entitled "Option Sales Agreement," and petitioners are referred to as "Sellers" and Dixie as "Buyer." However, it is the substance of an agreement that is controlling, not the form or terminology used by the parties. Rutledge v. United States, supra.The wording of an agreement is not determinative of whether an economic interest was retained. Wood v. United States, supra; Ollie G. Rose, supra.Petitioners point to the limerock deed recorded in the Sumter County records with the appropriate Florida documentary stamps affixed *31 as strong evidence of a sale. We disagree. The tax consequences of an agreement are not governed by the legal formalities that surround it. Rutledge v. United States, supra.The economic realities of an arrangement are determinative, not the form. Commissioner v. P.G. Lake, Inc., 356 U.S. 260 (1958); Ollie G. Rose, supra.
We think it evident that the economic realities of the agreement before us place petitioners in the position of having retained an economic interest in the minerals on their property. 9 The agreement provides Dixie with the opportunity to purchase only that amount of limerock desirable and profitable to extract.In return for the minerals, petitioners receive royalties based solely on the quantity and quality of that removed. The provisions of the contract entitling Dixie to unilaterally terminate its obligations affect the entire arrangement between the parties. The purported sale of all petitioners' interest in the minerals is negligible in substance when viewed in light of Dixie's right to end the relationship at will. [5] The buyer's ability to back out of its obligations is strong evidence that the parties had *32 not entered into a completed sale. Wayman A. Collins, supra. It is manifest that Dixie placed itself under no obligation to purchase the entire mineral deposit on petitioners' land, indicating that the arrangement is more in the nature of a mineral lease rather than a sale. See Hair v. Commissioner, 396 F.2d 6 (C.A. 9, 1968), affirming a Memorandum Opinion of this Court; and Laudenslager v. Commissioner, 305 F.2d 686 (C.A. 3, 1962), affirming a Memorandum Opinion of this Court, certiorari denied 371 U.S. 947 (1963). Petitioners argue that, notwithstanding the termination provisions, Dixie was obligated to continue making a $10,000 "minimum yearly guaranteed payment" per contract year if it 10 desired to maintain the contractual relationship. The payment was required irrespective of whether an equivalent value of tonnage was removed or not. [6] Petitioners therefore maintain that an economic interest was not retained, as the "minimum yearly guaranteed payment" does not depend *33 upon the extraction of the minerals. We disagree. It would be unrealistic, to say the least, to assume that Dixie would continue its relationship with petitioners, making $10,000 yearly payments [7] for an indefinite period, when mineral extraction could not prove profitable. Rather, it would merely terminate its obligations and cease removal of the limerock regardless of what remained on petitioner's land. We think it clear that the yearly guaranteed payments are but advance royalties, the continued payment of which is dependent solely upon Dixie's extraction of the minerals. Petitioners contend that Crowell Land & Min. Corp. v. Commissioner, 242 F.2d 864 (C.A. 5, 1957), reversing 25 T.C. 223 (1955), is dispositive *34 under the facts before us. See Jack E. Golsen, 54 T.C. 742 (1970), affd. 445 F.2d 985 (C.A. 10, 1971), certiorari denied 404 U.S. 940 (1971). We do not agree. In 11 Crowell the buyers were given a five-year period of time to go upon the land and remove the sand and gravel purchased. The contract provided for advance payments, similar to the matter before us, but the obligation to pay was not an indefinite one subject to unilateral termination. Termination, prior to the end of the five-year period, could only be effected by a failure of the buyer to meet its obligations. The court found this provision to be in the nature of a vendor's lien to protect the payments due. As shown, Crowell is factually distinguishable from the matter before us. Hence, we find no obligation to find it controlling. For all of the reasons stated above we hold petitioners to have retained an economic interest in the minerals, looking solely to the extraction of limerock for a return on their investment. [8] Therefore, the income received by petitioners is properly characterized as ordinary income. *35 In light of our holding above we must determine the correct percentage rate to be used by petitioners in reporting their income. For the years in question, section 613(b) (7) of the 12 Internal Revenue Code of 1954[9] provided for a 15-percent depletion allowance [10] for "all other minerals" not previously listed in the section. Therefore, by definition, section 613(b) (7) includes the limerock contained on petitioners' land. An exception to this 15-percent depletion allowance was provided, however, in the event that the mineral was eventually used in one of the capacities specifically listed in the statute: the percentage shall be 5 percent for any such other mineral * * * when used or sold for use, by the mine owner or operator as * * * road material * * * *36 13 Petitioners argue that they are entitled to a percentage depletion rate of 15 percent on all the limerock removed, even though a stipulated portion was eventually used as road materials. They maintain that since the limerock was of uniform quality, capable of furnishing the agricultural and quick-lime markets (such use sanctioning a 15-percent depletion rate), they should not be deprived of the higher rate, irrespective of use. Respondent, on the other hand, maintains that the "use test" provided in section 613(b) (7) is conclusive, such that limerock used for road materials, regardless of quality, is subject to a 5-percent depletion allowance. We agree with respondent. The language of section 613(b) (7) is clear in establishing the "use test" as the appropriate means of determining the proper percentage depletion rate allowable. See H. Rept. No. 1337, to accompany H.R. 8300, 83d Cong., 2d Sess., pp. 57, 58 (1954); S. Rept. No. 1622, to accompany H.R. 8300, 83d Cong., 2d Sess., p. 77 (1954), and Conf. Rept. No. 2543, 83d Cong., 2d Sess., pp. 51, 52 (1954). To allow the higher percentage depletion rate for agricultural and quicklime quality limerock, even when used as *37 road material, tends to give the higher grade limerock mining operations an unfair competitive advantage over the suppliers of the lower grade mineral, which is more appropriately used for road construction. G. & W.H. Corson, Inc., 54 T.C. 668 (1970), affd. per curiam 453 F.2d 578 (C.A. 3, 1971). 14 Contained in Corson, Inc., is a detailed analysis of section 613(b) (7), including the definitional parameters and legislative history of the statute. We find it unnecessary to repeat the entire discussion therein, but do quote briefly from the opinion at page 677, as it applies here: The purpose of the "use test" incorporated into section 613(b) (7) was to prevent such discrimination. It seems clear that Congress intended the "use test" contained in section 613(b) (7) to be interpreted in such a way that products competing with minerals which were entitled to only a 5-percent rate would not enjoy a competitive advantage merely because under section 613(b) (7) the producer of "other minerals" is entitled for purposes not so competitive to use the 15-percent depletion rate. In accordance with the analysis in Corson, Inc., and for the reasons outlined *38 above, we hold the proper percentage depletion rate available to petitioners for limerock used as road materials to be 5 percent. Decision will be entered under Rule 50. Footnotes
1. Respondent concedes that if a sale or exchange has taken place the proceeds are subject to treatment as long-term capital gain. ↩
2. Respondent concedes that if ordinary income treatment is proper, the receipts are subject to the proper percentage depletion rate. ↩
3. This provision is the amended version, agreed to by the parties on April 19, 1967, and in effect for the years in question. ↩
4. In an amendment to the agreement dated April 19, 1967, Dixie was to pay ad valorem taxes solely attributable to the permanent improvements constructed by Dixie on the land. ↩
5. See paragraphs (3) and (24) of the agreement which must include, among other things, the profitability of the venture on the part of Dixie. ↩
6. See paragraph (6) of the agreement as amended. ↩
7. Although it is unclear, it appears that Dixie, after making an initial downpayment of $500 on the "minimum yearly guaranteed payment," may terminate the contractual relationship at any time during the year, relieving itself of any further obligation to pay any balance remaining on the minimum payments. See paragraph (6) of the agreement as amended, coupled with paragraphs (3) and (24). ↩
8. Although this case was fully stipulated, it does not relieve petitioners of their burden of proof. Welch v. Helvering, 290 U.S. 111↩ (1933). We think it clear that petitioners have not met this burden. 9. All section references are to the Internal Revenue Code of 1954 unless otherwise indicated. SEC. 613. PERCENTAGE DEPLETION. (b) Percentage Depletion Rates. - The mines, wells, and other natural deposits, and the percentages, referred to in subsection (a) are as follows: * * * (7) 15 percent - all other minerals * * * except that, unless sold on bid in direct competition with a bona fide bid to sell a mineral listed in paragraph (3), the percentage shall be 5 percent for any such other mineral (other than slate to which paragraph (5) applies) when used, or sold for use, by the mine owner or operator as rip rap, ballast, road material, rubble, concrete aggregates, or for similar purposes. * * * ↩
10. Sec. 613(b) (7) was subsequently amended by sec. 501(a) of Public Law 91-172, effective for taxable years beginning after October 9, 1969, to provide a 14-percent depletion rate. ↩