**Lee R. FILGO and wife Thelma Filgo**

**v.**

**UNITED STATES of America.**

**Civ. A. No. CA 3-6507-E.**

United States District Court,
N. D. Texas,
Dallas Division.

July 17, 1974.

John L. Burke, Jr., Dallas, Tex., for plaintiffs.

Frank D. McCown, U. S. Atty., Fort Worth, Tex., Martha Joe Stroud, Asst. U. S. Atty., Michael D. Cropper, Tax Div., Dept. of Justice, Dallas, Tex., for defendant.

## MEMORANDUM OPINION

MAHON, District Judge.

This is a suit brought for refund of federal income taxes in the amount of $16,662.43 plus interest of $1,003.57 for the taxable years 1968, 1969, and 1970. During those years, sand, gravel, and fill dirt were extracted from the plaintiffs' 168-acre farm. They urge that the proceeds are payments for the sale of capital assets and that for tax purposes they are entitled to the treatment accorded capital gains. Int.Rev.Code of 1954, § 1201(b), 26 U.S.C. § 1201(b) (1970).

Plaintiffs Lee and Thelma Filgo entered into an agreement with Texas Industries, Inc., in March of 1968 under which, according to the terms of the contract, plaintiffs did "Grant, Bargain, Sell and Convey unto [Texas Industries] 25,000 cubic yards of sand and gravel. . . ." for which they were paid $25,000.00. Included in the agreement was a provision whereby Texas Industries, Inc., received "exclusive irrevocable options to purchase . . . all or any part of the sand and gravel contained in, on, and under the land . . . in as many increments of 25,000 cubic yards of sand and gravel as Grantee shall elect for a consideration of $6,250.00 per increment; provided, however, should Grantee estimate that less than 25,000 cubic yards of sand and gravel remains in said land, Grantee may purchase an increment equal to such lesser amount at the rate of $0.25 per cubic yard thereof." The agreement allowed for the exercise of option rights at any time during the initial one-year term. The exercise of such rights to purchase one or more increments during any given year would result in there being an extension of the term for an additional year commencing at the conclusion of the term in which it had been exercised. A similar contract was drawn with regard to fill dirt which was conveyed in lots of 100,000 cubic yards. In addition to the original conveyances of sand and gravel and of fill dirt, Texas Industries received four subsequent increments of sand and gravel and nine increments of fill dirt pursuant to the option provisions during the years in question.

Defendant claims "that the transfers of fill dirt and sand and gravel by Mr. Filgo were made pursuant to what is, in effect, a mineral lease; that Mr. Filgo retained an economic interest in the sand and gravel and fill dirt in place; and

that the income from the transfers of fill dirt and sand and gravel was ordinary income from mineral production." In the alternative, the government contends that if the transactions in question were sales, they were sales of property held by the taxpayer primarily for sale to customers in the ordinary course of trade or business, for which capital gains treatment would not be available. Int.Rev.Code of 1954 § 1221, 26 U.S.C. § 1221 (1970).

In the cause at bar considerable emphasis has been placed upon the "economic-interest" concept enunciated in Palmer v. Bender, 287 U.S. 551, 53 S.Ct. 225, 77 L.Ed. 489 (1933),[1] which in most instances is the test that is determinative of the right to an allowance for depletion with regard to the extraction of minerals. In *Palmer* the Supreme Court said that an economic interest exists in "at least . . . every case in which the taxpayer has acquired, by investment, any interest in the oil in place, and secures, by any form of legal relationship, income derived from the extraction of the oil, to which he must look for a return of his capital." 287 U.S. at 557, 53 S.Ct. at 226. This test has been adopted by the Treasury Department and is applicable to solid minerals including sand and gravel, and fill dirt. Treas.Reg. § 1.611–1(b)(1) (1960); 26 C.F.R. § 1.611–1(b)(1) (1973); Wood v. United States, 377 F.2d 300 (5th Cir. 1967), cert. denied, 389 U.S. 977, 88 S. Ct. 465, 19 L.Ed.2d 472 (1967).

It has been said that the term "economic-interest" "plagues the tax consequences of every assignment of property in all extractive industries . . .,"[2] and Professor Sneed[3] writes:

"An understanding of this concept is the bedrock upon which any reasonably thorough appreciation of mineral tax law must be built. Grasp the eco-

---

1. The principles contemplated by the term "economic interest," however predate Palmer v. Bender. See Sneed, The Economic Interest—An Expanding Concept, 35 Tex.L. Rev. 307, 309–318 (1957).

2. C. Breeding, F. Burke, A. G. Burton, Income Taxation of Natural Resources ¶ 2.09 at 208 (1972).

3. Now Judge Sneed; became member of Court of Appeals for Ninth Circuit on August 24, 1973.

nomic-interest notion and many arcane aspects of this highly glamerous field will stand revealed." [4]

While the above-stated definition of the term "economic-interest" seems relatively clean and concise, the decisions relative to the concept reflect that it should be approached guardedly. The Fifth Circuit Court of Appeals has made mention of the "subtleties and intricacies of the economic interest test," [5] and one authority refers to the concept as "mystifying and somewhat illusory." [6] Mr. Justice Frankfurter wrote of the "over-nice distinctions" in this area of the law as "gossamer lines . . . which hardly can be held in the mind longer than it takes to state them. . . ." [7] In short, the expression "economic-interest" is, in many ways, deceptive in its appearance of simplicity.

Having examined those cases in which the economic interest test has been construed,[8] including a considerable number of decisions by the Court of Appeals for the Fifth Circuit,[9] this Court expresses its qualified agreement with the statement of the Government in its brief wherein it is said:

"The issue presented here is whether the contract was in essence a sale of minerals in place or a mineral lease. If a sale, as contended by taxpayers, the payments they received constituted proceeds from the sale of a capital asset and were taxable as capital gain. If the transaction was a lease agreement, as contended by the Commissioner of Internal Revenue, the payments were taxable as ordinary income subject to an allowance for depletion."

The Government's recitation of "the issue presented" may appear to be a statement of the obvious. As noted above, however, the Court's accord is not unconditional. While the resolution of the "lease-sale" dichotomy and the answering of the question whether an economic interest has been retained may in some measure be implicit in each other, they are not identical. Determining the nature of the agreement that is the subject of inquiry does not necessarily determine whether an economic interest has been retained by the taxpayer. Vest v. Commissioner of Internal Revenue, 481 F.2d 238, 244 (5th Cir. 1973).

The taxpayer urges that several separate independent bona fide sales are before the Court and that they should be viewed as unrelated occurrences for tax purposes. In this regard the Court notes that a specific quantity could be segregated from a mineral interest and could be isolated for the purpose of

4. Sneed, *op. cit.*

5. Wood v. United States, 377 F.2d 300, 305 (5th Cir. 1967), cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967).

6. C. Breeding, F. Burke, A. G. Burton, *op. cit.*

7. Burton-Sutton Oil Co. v. Commissioner of Internal Revenue, 328 U.S. 25, 38, 66 S.Ct. 861, 868, 90 L.Ed. 1062, 1070 (1946) (dissenting opinion); *cf.* Bloomenthal, Disposition of Mineral Properties—A Reappraisal of Tax Consequences on Incomplete Dispositions, 16 Wyo.L.J. 1, 11; 60 Mich.L.Rev. 1188 (1962), where the observation is made that the decisions concerning the economic-interest test reflect "the development of distinctions which defy rationalization."

8. Recent decisions concerning the economic-interest test are Winters Coal Co., Inc. v. Commissioner of Internal Revenue, 496 F.2d 995 (5th Cir. 1974), and Cox v. United States, 497 F.2d 348 (4th Cir. 1974).

9. Excluding cases arising from this Circuit in which there was a subsequent decision by the Supreme Court, the Court of Appeals for the Fifth Circuit has had occasion since 1957 to address itself to the economic-interest question in the following instances: Vest v. Commissioner of Internal Revenue, 481 F.2d 238 (1973); Rhodes v. United States, 464 F.2d 1307 (1972); Rutledge v. United States, 428 F.2d 347 (1970); Wood v. United States, 377 F.2d 300 (1967) cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967); United States v. Witte, 306 F.2d 81 (1962); Albritton v. Commissioner of Internal Revenue, 248 F.2d 49 (1957); and Crowell Land & Mineral Corp. v. Commissioner of Internal Revenue, 242 F.2d 864 (1957), *noted at* 71 Harv.L.Rev. 376 (1957).

sale.[10] Further, there appears to be no reason why an owner of property would be necessarily precluded from making disposition thereof through a multiple of transactions. The Government would place itself in an untenable position were it to claim that a property owner could engage in but one sale or that a given purchaser could buy no less than the whole. Nor does it seem there would be any reason why an owner of an interest in land could not avail himself of a series of conveyances to a particular transferee to divest himself of his interest.[11]

■ It is, however, axiomatic that the substance of a contract's terms will prevail over its form and that an analysis of its provisions and the related facts may be appropriate in determining the "essential character" of a transaction. Vest v. Commissioner of Internal Revenue, 481 F.2d 238, 242, 243 (5th Cir. 1973); Rhodes v. United States, 464 F.2d 1307, 1311 n. 4 (5th Cir. 1972); Rutledge v. United States, 428 F.2d 347, 352 (5th Cir. 1970). Each case must be decided on its own facts, Estate of Walker v. Commissioner of Internal Revenue, 464 F.2d 75, 77 (3rd Cir. 1972); Wood v. United States, 377 F.2d 300 (5th Cir. 1967), and the use of word of "sale" will not necessarily be controlling. Vest v. Commissioner of Internal Revenue, 481 F.2d 238, 243 (5th Cir. 1973); Rutledge v. United States, 428 F.2d 347, 352 (5th Cir. 1970); Hartman Tobacco Co. v. United States, 471 F.2d 1327, 1329 (2d Cir. 1973).

■ Parties may enter into any agreement they want, even if the particular terms are chosen for the purposes of reducing taxes. Cowden v. Commis-

sioner of Internal Revenue, 289 F.2d 20, 23 (5th Cir. 1961); Gregory v. Helvering, 293 U.S. 465, 469, 55 S.Ct. 266, 267, 79 L.Ed. 596, 599 (1935). However, it is to be observed that that part of the Internal Revenue Code providing for capital gains "has always been narrowly construed so as to protect the revenue against artful devices." Commissioner of Internal Revenue v. P. G. Lake, 356 U.S. 260, 265, 78 S.Ct. 691, 694, 2 L.Ed. 2d 743, 748 (1958). Further, the taxpayer shoulders the burden of establishing that he qualifies for capital gain treatment. Hair v. Commissioner of Internal Revenue, 396 F.2d 6, 8 (9th Cir. 1968); Schreiber v. United States, 382 F.2d 553 (7th Cir. 1967).

■ It is in this context that the Court believes that the option clause in the agreement between Filgo and Texas Industries is of cardinal importance, for it is that provision which gives Texas Industries what is in reality the right to mine the sand and gravel from the Filgo property to exhaustion over an indefinite period of time. Further, the Court finds it extremely difficult to ignore that the taxpayer has an interest in the development of the mineral estate and that the amount of income he realizes from his arrangement with Texas Industries is almost entirely dependent upon the quantity of sand, gravel, and fill dirt Texas Industries mines.[12] In a real sense no specific predetermined quantity of minerals was to be mined, no total price therefor was established, and the transferor continued in a significant sense to participate in the risks of mining. United States v. White, 401 F.2d 610, 614 (10th Cir. 1968). Although Vest v. Commissioner of Internal Revenue, 481 F.2d 238 (5th Cir. 1973), is

10. "[P]roperty interests may be segregated in transactions constituting sales or exchanges. . . . Rights to minerals below a specified depth may be assigned while rights above such depth are retained. Rights to property interests in a geographical area, such as 'the SW¼ of section 10' may be conveyed without any effect on similar interests in contiguous areas." C. Breeding, F. Burke, A. G. Burton, Income Taxation of Natural Resources ¶ 5.01 at 504 (1972).

11. Winstead, How to Obtain Capital Gain Treatment of the Sale of Sand and Gravel, P-H Oil & Gas Taxes ¶¶ 1020, 1020.7 at 1442 (1970).

12. Cf. Alkire v. Riddell, 397 F.2d 779 (9th Cir. 1968).

factually different, the concerns voiced there have relevance to the immediate cause. There the Court said:

> "The Vests' right to receive payments was linked inextricably to Shell's withdrawal of [the mineral]. . . . This symbiotic relationship—between payments and production—is the kind of retained interest which makes the Vest-Shell agreement incompatible with a sale and more in the nature of a lease." 481 F.2d at 244-245.

Given the overall circumstances herein present this Court concludes that though the efforts were skillful, they are, nevertheless, more in the nature of what has been referred to as "a transparent attempt to metamorphose a royalty agreement into a sale." Ollie G. Rose v. Commissioner of Internal Revenue, 56 T.C. 185 (1971). As in *P. G. Lake,* "These arrangements seem to us transparent devices. Their forms do not control. Their essence is determined not by subtleties of draftsmanship but by their total effect." 356 U.S. at 266–267, 78 S. Ct. at 695. While the agreements here in question have characteristics of both sale and lease, considering each transaction in its entirety I conclude that the agreements differ significantly from those upheld in other cases as being sales. See Vest v. Commissioner of Internal Revenue, 481 F.2d 238, 244 (5th Cir. 1973). I conclude that the agreements under consideration more closely resemble leases than absolute sales of the minerals in place. Oliver v. United States, 408 F.2d 769 (4th Cir. 1969). I further conclude that the taxpayers, under these agreements, retained an economic interest in the minerals in place and that their incomes therefrom were dependent upon the extraction of those minerals.

In reaching the above conclusions the Court has given considerable weight to the option provisions of the contracts in question. There is little authority of which the Court is aware relative to this particular point. Some support, however, is found in Commissioner of Internal Revenue v. Pickard, 401 F.2d 615 (10th Cir. 1968). There a taxpayer had rights in 6400 acres pursuant to three federal oil and gas leases. She entered into agreements with a petroleum company under which she was paid $172,800 for options to acquire the leases from her within a three-year period. The taxpayer urged that the tax treatment for the money received for the options could not be determined until the options were either exercised or expired, and that the proceeds were not taxable until one of those contingencies occurred. The Commissioner argued that even if the options were exercised the payments for them would be bonus money for a lease or sublease, and that therefore the proceeds would be ordinary income in either event [13] and thus taxable in the year received.[14]

The Court said the issue presented "is determined by whether or not the option if exercised would result in an economic interest being retained in the taxpayer and thus be placed in the sale or lease category." While the agreement in *Pickard* more clearly provided for "lease" rights and royalty payments upon exercise of the options than do the contracts at bar, it is to be noted (1) that the presence of an option did not preclude there being a retained economic interest relative thereto, and (2) that the Court deemed it appropriate to consider tax consequences and determine the economic-interest question on the premise of the options having been exercised.[15] This seems to support look-

---

13. The taxpayer had conceded that the payment would be ordinary income if the option were not exercised.

14. With regard to taxation of payments for option rights see Internal Revenue Code of 1954. 26 U.S.C. § 1231 et seq. (1970).

15. In *Pickard* the court was dealing solely with payments received for option rights, which had been conceded by the taxpayer to be ordinary income if the options were not exercised. While the circumstances at bar make this case clearly distinguishable from *Pickard,* it is believed that the rationale re-

ing to the realities of an agreement and the rights that may be exercised thereunder as the Court believes to be proper here; Carr Staley, Inc. v. United States, 496 F.2d 1366, No. 73–3198 (5th Cir. 1974).

■■ Further, while the specifics of property law were not directly addressed in *Pickard,* it is here noted that in reaching its conclusions this Court has not been unaware that an option contract does not pass to the optionee an interest in the real property.[16] In this connection it is to be observed that concepts of title are not determinative of tax consequences,[17] that the tax laws are to be given uniform application, and that technicalities of local law are not controlling.[18]

Additionally, while there might be some attraction to treating the first payment of $25,000 separately from any other transactions, it is believed that the sounder and more realistic approach requires that the "purchases" under each of the agreements are really part of a single transaction. Consistent with this is this Court's conclusion that the initial payment of $25,000 was in the nature of an advance royalty.[19]

Further, there may be some support for the Court's conclusions provided by resolving what remedies would be available to Texas Industries if the taxpayers were to breach the contractual option provisions. First, there would be specific performance. If, however, that were unavailable, the damages would be measured by the value of performance.[20] In attempting to place the injured party in the position he would have held had there been no breach, profits that would be subject to being realized under the indefinite length of the contract would be recoverable. This would suggest to the Court that perhaps something other than isolated unrelated sales are before the Court.

One final observation is perhaps not inappropriate. If one were to take the rationale urged by the taxpayers to its logical extension, an agreement could be drafted under which each five-cubic-yard or ten-cubic-yard load of sand and gravel hauled from a pit under an option to an individual concern would constitute a separate sale. This Court would be unable to conclude that capital gains treatment was available under such circumstances. I am unwilling to say that the result reached herein is dictated in every instance where a conveyance is made during the term of an agreement that has been extended pursuant to an option provision; there may be sound business reasons and economic exigencies that not only dictate that options are advisable, but also are consistent with a transaction being treated as a sale.[21] This Court, however, is not impressed that such circumstances are

flected and the approach taken therein are somewhat supportive of this Court's actions.

16. *See e. g.,* VIII Thompson, Real Property § 4570 at 509 (1940). *But cf.,* 1A Corbin, Contracts § 272 at 582 (1963) where the suggestion is made that an equitable interest does obtain under an option.

17. Wood v. United States, 377 F.2d 300, 309 n. 23 (5th Cir. 1967), cert. denied 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472 (1967).

18. Kirby Petroleum Co. v. Commissioner of Internal Revenue, 326 U.S. 599, 603, 66 S. Ct. 409, 411, 90 L.Ed. 343, 348 (1946); Palmer v. Bender, 287 U.S. 551, 555, 53 S.Ct. 225, 226, 77 L.Ed. 489, 492 (1933); Burnet v. Harmel, 287 U.S. 103, 110–111, 53 S.Ct. 74, 77, 77 L.Ed. 199, 205 (1933); United States v. White, 401 F.2d 610, 612 (10th Cir. 1968); Carr Staley, Inc. v. United

States, 496 F.2d 1366, No. 73–3198 (5th Cir. 1974).

19. *See* United States v. White, 311 F.2d 399 (10th Cir. 1962), where the initial payment was held to be a sale and separable from any subsequent payments. *Compare and contrast* United States v. White, 401 F.2d 610 (10th Cir. 1968), where the former decision was overruled.

20. See Matthewson v. Fluhman, 41 S.W.2d 204 (Tex.Com.App.1931, judgmt. adopted); 43 Tex.Jur.2d Oil and Gas § 531 (1963).

21. *See* Swenson, An Analysis of Mining Options and Leases, 8 Rocky Mtn. Law Inst. 47, 60 (1963); Hamilton & Maxwell, The Sale of Oil and Gas in Place—Redeterminations and Reversionary Interests, P–H Oil and Gas Taxes—Natural Resources ¶ 1017.5 at 1351 (1971).

herein present in such a degree as would allow the Court to conclude that the agreements in consideration are, for tax purposes, other than leases and that the taxpayers have in fact, retained an economic interest in the minerals in place. Accordingly the proceeds received during the taxable years are ordinary income.

In addition to the findings and conclusions implicit in what has been heretofore stated, the Court expressly makes the following findings of fact and conclusions of law.

## FINDINGS OF FACT

1. Lee R. Filgo and Thelma Filgo are married residents of Dallas County, Texas. Mr. and Mrs. Filgo have resided in Texas at all times pertinent to this litigation.

2. Mr. and Mrs. Filgo purchased a 168-acre farm located on Cleveland Road in southern Dallas County in 1954. They took up residence on the farm and have resided there since that time.

3. When Mr. and Mrs. Filgo purchased the farm in 1954, a small sand and gravel pit was located on the farm. Mr. Filgo either knew at the time of purchase of the farm or discovered later that substantial quantities of commercial grade sand and gravel as well as commercial grade fill dirt lay under the top soil of the 168-acre tract.

4. Commercial grade sand and gravel is processed by washing and screening and is utilized in miscellaneous construction as well as in making concrete.

5. Commercial grade fill dirt is utilized in building roads by both the county and state governments. There are several grades or qualities of both sand and gravel and fill dirt.

6. On March 20, 1968, Mr. and Mrs. Filgo entered into two contracts which were called "Deed and Agreement (for sand and gravel) and Deed and Agreement (for fill dirt)".

7. For $6,250, Mr. Filgo "sold" Texas Industries, Inc., 25,000 cubic yards of sand and gravel from the 168-acre tract, but no specific location of the minerals within the 168-acre tract was specified. Texas Industries, Inc., had all of the necessary rights to use the surface of the 168-acre tract for mining and related operations with an additional six months time to remove its equipment after termination of the "agreement".

8. The "agreement" terminated one year from March 20, 1968, unless Texas Industries exercised an option to purchase an additional "increment" of 25,000 cubic yards of sand and gravel before the expiration of that one-year period. Exercise of one option automatically extended the time for the exercise of another "option" for an additional period of one year commencing at the conclusion of the term during which the option was exercised. Texas Industries, Inc., was required to account for the extractions of sand and gravel on a monthly basis and Mr. Filgo could examine the Texas Industries, Inc., records during working hours.

9. Mr. Filgo promised to pay currently all ad valorem and other taxes assessed against the 168-acre tract during the term of the grant of the "options". The tax payment provision (Deed and Agreement, par. 5) further provided that if Mr. Filgo failed to pay the ad valorem taxes on the 168-acre tract, Texas Industries could pay the taxes and credit the tax payments toward the purchase of an "increment" of sand and gravel at the rate of $.25 per cubic yard.

10. Texas Industries could terminate mining operations on the tract after paying for a 25,000 cubic yard increment and could "reconvey" the remaining (unextracted) sand and gravel in the purchased "increment" to Mr. Filgo; but, Texas Industries, Inc., was under no obligation to remove the minerals already paid for. Texas Industries, Inc., was granted exclusive irrevocable options to purchase sand and gravel "increments" of 25,000 cubic yards for a consideration of $6,250 per increment. Mr. Filgo was to furnish Texas Industries, Inc., with a title insurance policy after the exercise of each option to pur-

chase an "increment" and a deed substantially in the form of the March 20, 1968, Deed and Agreement.

11. The second Deed and Agreement of March 20, 1968, concerning the fill dirt (stip. Ex. B) contained similar provisions to the Deed and Agreement concerning the sand and gravel although the provisions were not as extensive.

12. On their federal income tax returns (Form 1040) for each of the years 1968, 1969, and 1970, Mr. and Mrs. Filgo reported the proceeds from the sand, gravel and fill dirt as gains from the sale or exchange of a capital asset.

13. The Commissioner of Internal Revenue, in the course of an audit of Mr. and Mrs. Filgo's tax returns, determined that the sand and gravel and fill dirt were not capital assets and asserted a deficiency in tax for those years.

14. Mr. and Mrs. Filgo paid the asserted deficiency on October 29, 1970, and filed timely claims for refund of the additional taxes paid on the theory that the sand and gravel and fill dirt were capital assets.

15. The Internal Revenue Service disallowed the claims for refund and this suit was instituted within the time provided by law.

16. Pursuant to the terms of the sand and gravel agreement executed March 20, 1968, the following payments were made by Texas Industries, Inc., to plaintiffs on the dates indicated:

| | | | |
|---|---|---|---|
| 3-20-68 | 1st increment | 25,000 cubic yds. | $6,250.00 |
| 3-14-69 | 2nd increment | 25,000 cubic yds. | 6,250.00 |
| 3-13-70 | 3rd increment | 25,000 cubic yds. | 6,250.00 |
| 3-15-71 | 4th increment | 25,000 cubic yds. | 6,250.00 |
| 9-29-71 | 5th increment | 25,000 cubic yds. | 6,250.00 |

Each of the above increments of sand and gravel were paid for prior to removal.

17. Pursuant to the terms of the fill dirt agreement executed March 20, 1968, the following payments were made by Texas Industries, Inc., to plaintiffs on the dates indicated: [22]

| | | | |
|---|---|---|---|
| 7-8-69 | 1st increment | 200,000 cubic yds. | $20,000.00 |
| 9-8-69 | 2nd increment | 100,000 cubic yds. | 10,000.00 |
| 4-23-70 | 3rd increment | 100,000 cubic yds. | 10,000.00 |
| 6-22-70 | 4th increment | 100,000 cubic yds. | 10,000.00 |
| 9-15-70 | 5th increment | 200,000 cubic yds. | 20,000.00 |
| 1-9-71 | 6th increment | 100,000 cubic yds. | 10,000.00 |
| 2-17-71 | 7th increment | 100,000 cubic yds. | 10,000.00 |
| 7-7-71 | 8th increment | 100,000 cubic yds. | 10,000.00 |

Each of the above increments of fill dirt were paid for prior to removal.

18. Both Mr. and Mrs. Filgo and Texas Industries, Inc., complied with the terms of the two "agreements" executed March 20, 1968.

19. In October 1962, prior to the execution of the "agreements" Mr. Filgo and one Roy Moore entered into a lease agreement covering the 168 acres and authorizing Mr. Moore or his company to extract sand and gravel and fill dirt

22. That the first increment of fill dirt was conveyed more than a year after the parties entered into the agreements is explained by the fact that the fill dirt contract was drafted to allow Texas Industries to acquire dirt during the initial term of the *sand and gravel* agreement or any extension thereof.

from Mr. Filgo's farm for payments of 20 cents per cubic yard for washed gravel, sand and rock, 15 cents per cubic yard for roadbed treatment material (road gravel) and 10 cents per cubic yard for fill dirt.

20. Mr. Moore made substantial payments pursuant to the lease agreement for sand and gravel, roadbed material and fill dirt during the period October 1962 through March 1968. The lease agreement is designated Exhibit G to the stipulation of the parties.

21. It is undisputed that the lease agreement executed between Roy Moore and Lee Filgo was a mineral lease.

22. Any conclusion of law deemed to be a finding of fact is hereby adopted as a finding of fact.

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action pursuant to 28 U.S.C., Section 1346(a)(1), and venue in this Court is proper pursuant to 28 U.S.C., Section 1402.

2. It is undisputed that the two agreements meet the requirements of the first test of an economic interest in that Mr. Filgo acquired by investment an interest in the minerals in place. The more difficult question, however, is whether he must look to the extraction of the mineral (sand and gravel and fill dirt) for a return of his capital.

3. This Court is not bound by the four corners of the two agreements of March 20, 1968, but may go outside those agreements to analyze the practical effect, and thus the substance of the alleged sales. Rutledge v. United States, 428 F.2d 347 (5th Cir. 1970). The mere wording of an agreement is not properly determinative of whether an economic interest was retained. Rutledge v. United States, *supra* at 352; Wood v. United States, 377 F.2d 300, 311 (5th Cir. 1967), cert. denied, 389 U.S. 977, see footnote 26 and accompanying text, 88 S.Ct. 465, 19 L.Ed.2d 472. The essence of an agreement is determined not by subtleties of draftsmanship but by total effect. Commissioner of Internal Revenue v. P. G. Lake, Inc., 356 U.S. 260, 266, 267, 78 S.Ct. 691, 2 L.Ed.2d 743 (1958).

agreed to pay minimum guaranteed roy-

4. The total effect of the agreements here is that Texas Industries, Inc., alties, albeit, in advance and in large units (25,000 cubic yards), for sand and gravel to be removed from the land by Texas Industries in the ordinary course of mining operations. The sole "economic" distinction between a typical mineral lease and the "agreements" in question here is that Texas Industries, Inc., the Grantee, lost the use of the $6,250 (an interest factor) from the time a $6,250 check for an "increment" was delivered to Lee Filgo until the 25,000th cubic yard of sand and gravel in that increment was removed from the 168-acre tract.

5. That the present case is an example of a "mineral lease" rather than a "sale" can be seen by contrasting the agreements here with those "agreements" which formed the crux of the litigation in Rhodes v. United States, 464 F.2d 1307 (5th Cir. 1972) a recent hard mineral extraction case in which the Court of Appeals for the Fifth Circuit found the arrangement to constitute a sale. In *Rhodes,* the purchaser bought a deposit of brick manufacturing clay on specific acreage within a larger (23 acres) tract whereas here Texas Industries' payments to Mr. Filgo merely gave it the right to remove 25,000 cubic yards without any specification of the area of removal. In *Rhodes,* the purchaser was obligated to purchase all the merchantable clay deposits in the larger (28 acres) tract. In the instant case, Texas Industries, Inc., had no such obligation, but merely had sequential options on 25,000 cubic yard measures of sand and gravel. In *Rhodes,* the purchaser was required to remove all the clay it had purchased and if the purchaser failed to do so, the seller was entitled to have the clay removed, any profit or loss from such removal by the seller to be attributed to the purchaser. By contrast, Texas Industries, Inc., had no obligation to remove all or any portion of one of the

25,000 cubic yard "increments" for which it had made payment.

6. When all of the important factors, deemed critical by the Court of Appeals in determining whether a taxpayer must look to extraction of the mineral to recover his capital, are applied to the two Deed and Agreements before this Court only one conclusion is possible. The $6,250 payments, although received before the mining operations took place and although ostensibly representing a purchase price for the minerals in place, were, in essence, dependent on the extractions of sand and gravel from the land. The same is true for the $10,000 payments for fill dirt.

7. Since both the agreement concerning sand and gravel and the agreement concerning the fill dirt provided for payments which were dependent upon extraction of the mineral, the taxpayers here had an economic interest in the fill dirt and sand and gravel in place within the 168-acre tract. Wood v. United States, 377 F.2d 300 (5th Cir. 1967), cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472; Rutledge v. United States, 428 F.2d 347 (5th Cir. 1970).

8. Since the taxpayers retained an economic interest in the minerals under the 168-acre tract, the two agreements executed March 20, 1968, are, for federal tax purposes, mineral leases, and the payments received by the taxpayers are minimum guaranteed advance royalties taxable as "ordinary income" pursuant to Section 61(a)(6) of the Internal Revenue Code of 1954. Burnet v. Harmel, 287 U.S. 103, 53 S.Ct. 74, 77 L.Ed. 199 (1932); Wood v. United States, 377 F. 2d 300 (5th Cir. 1967), cert. denied, 389 U.S. 977, 88 S.Ct. 465, 19 L.Ed.2d 472; Rutledge v. United States, 428 F.2d 347 (5th Cir. 1970).

9. It is noteworthy that the United States Court of Appeals for the 5th Circuit decision in the Wood case was rendered May 11, 1967, and the agreements between Mr. Filgo and Texas Industries, Inc., were executed March 20, 1968. It would appear that the taxpayers in this action were attempting by subtle draftsmanship and with one eye on the decision in Wood to make it appear that they had no retained economic interest in the minerals; yet, when the totality of the agreements and their effect is considered, the agreements are nothing more than mineral leases, and the agreements were "a transparent attempt to metamorphose a royalty agreement into a sale". Ollie G. Rose v. Commissioner, 56 T.C. 185 (1971).

10. Any finding of fact deemed to be a conclusion of law is hereby adopted as a conclusion of law.

11. Counsel for the defendant is instructed to prepare a proposed judgment in accordance with these findings.